O4NVPORC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PORTKEY TECHNOLOGIES PTE LTD.
and VIGNESH SUNDARESAN,

                Plaintiffs,

        v.                          23 Civ. 5074 (JPO)

ANAND VENKATESWARAN,

                Defendant.          Teleconference

------------------------------x
                                    New York, N.Y.
                                    April 23, 2024
                                    3:00 p.m.

Before:

                    HON. J. PAUL OETKEN,

                                    District Judge

                        APPEARANCES

DENTONS US LLP
     Attorneys for Plaintiffs
BY:  ROBERT M. WASNOFSKI, JR.
     DANIEL A. SCHNAPP
     MARY C. BRENNAN

GOODWIN PROCTER LLP
     Attorneys for Defendant
BY:  ROBERT D. CARROLL
     TIMOTHY KEEGAN

O4NVPORC

(Teleconference)

THE COURT:  Good afternoon.  This is Judge Oetken.

Mr. Hampton will call the case.

(Case called)

THE DEPUTY CLERK:  Starting with the plaintiff counsel, please state your name for the record.

MR. WASNOFSKI:  Robert Wasnofski, Dan Schnapp, and Mary Kate Brennan, counsel for plaintiff.

THE COURT:  Good afternoon.

Counsel for defendant.

MR. CARROLL:  Good afternoon, your Honor.

Rob Carroll from Goodwin Procter in Boston, for the defendant, Anand Venkateswaran.  With me is my colleague Timothy Keegan from our New York office.

THE COURT:  Good afternoon.

I scheduled the call in response to the letters regarding whether discovery should be stayed.  I know there's a motion to dismiss pending in the case and I haven't had an initial conference yet.  But I want to just get a little background about whether it makes sense to begin discovery or stay discovery.

So why don't we start.  Mr. Wasnofski, maybe you could tell me a little bit about the case.  I understand that the plaintiffs are claiming trademark infringement, false advertising, and state law claims relating to the defendant's

O4NVPORC

primarily -- I think the defendant's references to his role in his former employment.  Is that basically what it is?

MR. WASNOFSKI:  That is somewhat correct, your Honor.

Our clients are seeking claims for unfair competition, reverse passing off, false advertising, trademark infringement based on the defendant's repeated and extensive misrepresentations regarding claims that he's responsible for plaintiffs' business success.  That includes misuse of plaintiffs' trademarks and that has caused confusion in the public.  There are numerous instances of articles out there where those in the industry have basically heard the defendant's repeated statements and regurgitated those false statements as true.

THE COURT:  What kind of statements?

MR. WASNOFSKI:  So one in particular has to do with this historic purchase by plaintiff Mr. Vignesh regarding the purchase of the Beeple NFT.  It was a $69 million purchase.  The first purchase of an NFT through an auction house.  It was purchased through the Christie's auction house in 2021.

The defendant has gone around stating that he was one of the owners, he was responsible for the purchase.  He has also managed the plaintiffs' business generally which involves the purchase and housing of strategic NFTs.  He's claimed to be the -- basically the brains behind plaintiffs' operation.

And so if I can just summarize it, apart from the

O4NVPORC

trademark infringement aspects, case law is clear that holding oneself out as being responsible for someone else's goods and services constitutes reverse passing off.  That's been recognized by the Supreme Court in 2003; also more recently recognized by the Second Circuit in 2004 in *Societe des Hotels Meridien*, 380 F.3d 126.  And I'm sorry, I failed to give you the citation for the Supreme Court case.  That's 539 U.S. 23, *Dastar Corp. v. Twentieth Century Fox*.

This is not merely a case where he's made a statement on his Twitter account.  He is promoting himself repeatedly and continuously through industry conferences where he goes and speaks, you know, of these -- makes these false claims.  He includes them in his bios.

THE COURT:  Is it the fact that he was involved in assisting with the purchase?

MR. WASNOFSKI:  He was not involved in -- no, he was not.  He was an independent contractor hired by plaintiff who was responsible for communications.  There's an independent contractor agreement in place that was terminated mutually by the parties in early 2022.  And since then, the defendant has found that, you know, this is his 15 minutes of fame, having been associated with the plaintiff.  And he's gone out, like I said, to basically take credit for things that he should not have done so.  And they are inaccurate statements and he's confused the public.  And, in fact, the public has regurgitated

O4NVPORC

those statements; they, in fact, have been confused.

THE COURT:  So that independent contractor agreement, by the way, didn't have an arbitration clause, did it?

MR. WASNOFSKI:  It did not.  I don't believe it did, your Honor.  That's certainly nothing that we've discussed with defendant's counsel.

THE COURT:  Well, are you sure it didn't?

MR. WASNOFSKI:  We filed this case almost a year ago. What I can say is that the claims are not based on the independent contractor agreement in any way, shape or form. These are based on federal law.

THE COURT:  That doesn't mean they are not subject to arbitration.

Mr. Carroll, do you know whether there's an arbitration clause?

MR. CARROLL:  I don't, as I stand here today.  But this is certainly going to make me look into it.  So I don't have the agreement at my ready here, so I apologize.

THE COURT:  Mr. Wasnofski, what does your client really want?  I mean, if you could come to some agreement where he'd stop doing this, would that be enough, or is he looking for a bunch of money?

MR. WASNOFSKI:  Well, we took many months to try to discuss settlement.

Without getting into the details, essentially, we

O4NVPORC

wanted what you just suggested, which was, you know, an injunction, perhaps in the form of a consent judgment, where they would stop doing what they were doing, they would retract statements, you know, that the defendant made are within his control.  And there was a monetary component, but we never got to the point where that had really been discussed because we couldn't get past the first issue.

THE COURT:  All right.  Just at a high level, I know I haven't gotten into the motion to dismiss really in-depth, but I know it argues that the various statements and communications were not uses in commerce for the purpose of trademark law.

What's your response to that?  I mean, why doesn't this basically come down to someone saying something on their LinkedIn profile about where they worked in the past rather than making these statements, you know, in connection with selling or promoting a business or a product?

MR. WASNOFSKI:  Yes, your Honor.  I know we're not necessarily arguing the motion to dismiss, but with respect to, you know, whether or not the plaintiffs' claims are meritorious or not, they, in fact, are.  There are many allegations that are set forth in the letter.

But to your specific question, this is not just the use of a particular statement saying where the defendant had worked previously on his LinkedIn page.  As I said, for example, we issued discovery requests since the defendant filed

O4NVPORC

his letter with the Court.  And requests for admissions include 47 exhibits, which include dozens of statements, again, bios, conferences, YouTube videos that are recorded, you know, at these industry conferences where the defendant is making these claims.

Among the other exhibits are articles, as I referenced, where industry personnel who cover the area, so the area being NFTs, Web3 blockchain, you know, they repeat these falsehoods as if they are true.  So this is not just, you know, me indicating that I used to work at a prior firm on my LinkedIn page.

THE COURT:  All right.  Mr. Carroll, do you want to give me -- by the way, I should say, I worked with Mr. Carroll many years ago when we were both at Debevoise & Plimpton.  I assume this is the same Rob Carroll from the Debevoise days; is that right, Mr. Carroll?

MR. CARROLL:  It is.  That's correct, your Honor.

THE COURT:  Okay.  So I should put that on the record. This is not a situation where I see any need for recusal.  In fact, I think I had at least one other case where you were counsel.  We haven't seen each other, spoken in many years. But just to put that on the record so that if anyone wants to raise it, they should promptly.

But, Mr. Carroll, I want to give you a chance to respond to any points that are relevant to the issue of whether

O4NVPORC

discovery should be stayed as opposed to begun.  I mean, as you know, the rules don't provide for an automatic stay, so it's case by case.  You know, I mean, frankly, it turns largely on three factors, but one of the most important is the likelihood of success on a motion to dismiss, and particularly whether claims will remain, in which case I usually have discovery start versus jurisdictional questions or all of the claims being dismissed.  In any event, you're welcome to give me any high-level points you want to make.

MR. CARROLL:  Thanks, your Honor.

I guess I'd just like to respond briefly to Mr. Wasnofski's presentation, and then I am going to address the three factors on the motion to stay.

I think that Mr. Wasnofski was more expansive in his description of the claims than what is actually pleaded in the complaint, especially what's pleaded in *haec verba* in the complaint.  There are some broader, we believe, implausible claims that lack detail.

But, you know, from where we sit in this case, this is someone who was formally associated with a former company — whether employee or independent contractor I'm not sure matters for these purposes — who is accurately describing that former association and the role in that company.  And I think there are plenty of former employers out there who don't like that.  They say, This person is trying to trade off our former

association.  But they get advice from people like me, and I say those are the rules; you get to accurately describe, including using trademark names, your former association.

I will say the passing-off claim doesn't make any sense at all really because I think there is no dispute that Mr. Venkateswaran is not competing with Portkey his former -- with which he was formerly associated.  So the passing off of goods and services claim I think, frankly, doesn't make very much sense.

And also, you know, that goes to the use-in-commerce question.  If every time someone put their buyout out on LinkedIn and Twitter, it created a basis for federal jurisdiction, I think it would create a significant problem.  And that's one of the reasons why that requirement for use in commerce, as well as materiality and pleading plausible damages, is a threshold question.

On to the three prongs.

We think a stay is warranted here and we think that there's good cause for it.  As the Court noted, a motion to dismiss has been fully briefed.  It is a complete motion to dismiss.  We have asked for it to be with prejudice.  We wrote to the plaintiff before we filed it and asked if they would like to correct any of the defects we had found.  They declined to do so.  We filed it.  They filed an amended complaint.  We still proceeded with the motion and we believe that it's

O4NVPORC

meritorious. Even if it is not a complete victory on the motion to dismiss, I do think it will substantially narrow the breadth of discovery.

Discovery has been served since we filed our motion, as Mr. Wasnofski noted. As expected, it was very substantial discovery that they are asking for. 135 requests for admission. I will say in my 20-plus years of practicing, I think I've rarely seen five requests for admission that are actually useful. But 135 requests for admission, referencing 92 documents, 15 interrogatories, 24 requests for production of documents. And so the discovery is burdensome. It's pending right now. And we are in a position where the defendant will need to begin responding to it.

The third prong, the risk of unfair prejudice to the party requesting the stay. I mean, I heard Mr. Wasnofski saying that he believes that statements that are out of bounds are continuing. I actually don't think that's the case. I think it's only the plain vanilla former employer statements that are still there, which are clearly protected by the doctrine of nominative fair use and descriptive fair use.

I will note, you know, the plaintiff could have filed for a TRO, could have filed for a preliminary injunction. Presumably they came to the conclusion that they are not being irreparably harmed. So it's hard for me to figure out how they are prejudiced by waiting to see what the metes and bounds of

O4NVPORC

the actual claims will be before proceeding with discovery.

I guess my final point is there is a vast difference in resources, financial resources, on the two sides here.  The plaintiff gave an interview, which we cited, saying that he has more than $700 million in net worth.  Our client does not.  And, you know, paying for defending this case is a real hardship.  And, you know, I think that should come under consideration.

I think this case is no different from any other employer not liking their former employee with whom they've had a breakup, talking about that relationship.  It's just that the plaintiff here has $700 million and apparently no public shareholders to answer to.

So in light of all of that, we respectfully ask that the Court stay discovery until like three weeks after resolution of the motion to dismiss.

MR. WASNOFSKI:  Your Honor, if I may respond.

THE COURT:  I'm going to give you a chance to respond.

I want just at a high level, without sort of getting into the motion in detail, I do have a sense that to the extent that the specific statements are specific, that they're probably subject to fair use.  And to the extent that they're actionable, they are very vague.  Maybe there's enough to get some discovery, but, you know, the stuff where he's talking about his association with a prior employer, you know, I don't

O4NVPORC

know if it survives a motion to dismiss. But that's generally fair use if you're talking about your prior association with some other business or some event. I don't know. But that's just high level.

Say whatever you wanted to say.

MR. WASNOFSKI: Yes, yes. Thank you, your Honor.

This is not a fair use case. If the defendant had simply said he worked for -- or worked with, you know, as an employee or independent contractor, with the plaintiffs during certain periods of time, that would be fine. In fact, we've discussed that issue with defendant as we tried to reach a settlement.

The devil is in the details, as it always is, particularly when it comes to unfair competition or false advertising claims. For example, if you look at any of the statements -- you know, look at the 30-something page complaint, throughout defendant is making claims that he was a steward of Metapurse, namely the manager of Metapurse. That is not true. It's not just that he says he was associated with the plaintiff and worked with them for a period of time, maybe during which the plaintiffs, you know, had some business successes. They are actionable false statements that are made throughout. So that's one point.

Another is --

THE COURT: I have a question on that.

O4NVPORC

What is Metapurse?  What exactly is Metapurse?

MR. WASNOFSKI:  Metapurse is a fund that the -- it's basically a trademark.  It's a fund that the plaintiff created, he funded with his own monies, to use to purchase these NFTs. So the Beeple, the historic purchase of the Beeple NFT for 69 million, that was made through the Metapurse fund.

THE COURT:  You're saying, in fact, he had no association with it?

MR. WASNOFSKI:  Well, he didn't fund it, he didn't make the purchase, he was not the manager of that fund.  He was just, you know, an employee doing other things.

MR. CARROLL:  So he did have an association with it is the answer.

THE COURT:  Right.

MR. WASNOFSKI:  He certainly was not the steward of Metapurse.

THE COURT:  Just to be clear, if I used to work for, you know, Coca-Cola, and now I'm working for -- you know, for Fresca or whatever, a very small Brooklyn maker of soda pop, and I go to conferences and say, Hey, I used to work for Coke, and I sort of inflate what I did, you know, on my Twitter page and at a conference or something, is that a use in commerce?

MR. CARROLL:  No.

THE COURT:  I know you don't think it is.

Mr. Wasnofski?

O4NVPORC

MR. WASNOFSKI:  Your Honor, that alone probably isn't. I also don't think if you engage in that activity you'd have people writing about you and claiming that you, in fact, were responsible for the success of Fresca.  So this is -- again, it's the devil is in the details here.

If I can -- unless you have another question on that, your Honor, I just wanted to address a few other things.

One, the plaintiff has -- they already waited ten months, so they're continuing to be harmed the longer this case sits.  We understand you'll get to the motion when you get to it.  But, you know, that is why, after we took a good-faith effort to try to resolve this thing, we couldn't, that's when we, you know, moved forward with discovery.

Secondly, or just another point, defendant mentions, you know, the means that each party has.  He does that over and over and over throughout the briefing, throughout the letters to the Court.  That is completely irrelevant.

In fact, we've just recently learned that the defendant, with his new companies, has been paid -- or his companies have received millions of dollars from the -- I guess the organizations or third companies that are funding his new ventures.  And we know this because these transactions have been made through blockchains; and if you know what you're looking for, you can find that.  So it's not a David and Goliath sort of scenario like they argue.

O4NVPORC

If I can turn to the other factors.

So I touched upon the meritorious nature of plaintiffs' claims. I just want to point out that so long as there are arguments, even if they are strong arguments you thought on the defendant's behalf, so long as plaintiff is also making strong arguments, then the defendant would not have met the requisite strong showing that plaintiffs' claims are unmeritorious to justify a stay. And that's in the *Giuffre v. Maxwell*, 2016 WL 254932 at 2; it's a 2016 case in Southern District.

Cases look at, you know, particularly fact-intensive cases like this one here, which involves likelihood of confusion. Also courts have recognized in this district that it's difficult for the Court to conclude that defendants have substantial arguments for dismissal and, you know, denied similar situations.

If I can turn to the second factor, and that's whether or not the defendant would be unduly burdened. This is not a typical dispute where the defendant or the particular party seeking the stay has multiple employees, custodians, you know, lots of documents, lots of servers that they need to go through. This is an individual who is truly and fully in control of his prior statements, and he'll be able to respond to these discovery requests rather easily. There was no argument in the papers, as there couldn't be, that the

discovery was unduly burdensome because they hadn't been served yet.  It has since been served.

And as Mr. Carroll explained, there were -- there are 15 interrogatories which he didn't seem to take issue with; there are 24 RFPs, same thing.  The only thing he took issue with was the RFAs.  And those are extensive to the extent that they are a high number, perhaps more than Mr. Carroll has seen before.  But this case involves dozens and dozens of false statements by the defendant or others who have repeated it, and that's why I indicated there are 47 exhibits.  I think Mr. Carroll said 94, but 47 exhibits.  And there are multiple RFAs per exhibit.  So, you know, asking the defendant to admit that, you know, Exhibit 1 is a true and correct copy of blank, asking them to admit that Exhibit 1 reads as follows, you know, and then fill in the blank with the particular false statement made by the defendant, or repeated by the industry press.  So I just ask that you not be skewed by, you know, that number.

As to the third factor, I think I already touched on it basically.  You know, until the Court enjoins the defendant and orders that he removes these falsehoods that are within his control, our client will continue to be prejudiced, his reputation, goodwill and business activities.

THE COURT:  Okay.  So I did receive a proposed schedule, and I guess that reflects each side's view about how the case should go forward if I do order discovery to go

O4NVPORC

forward; is that right?

MR. WASNOFSKI:  That's right, your Honor.  That's document 38.

THE COURT:  Okay.  All right.  Got it.

And I see one side says no jury trial and one side says jury trial?  I guess it depends on what sorts of claims remain.  So I think it's premature to address that.

So I have the dates each side has proposed, if I do order discovery.

And I did also want to ask about settlement.

I don't think I'm going to rule right now on the stay, because I'm going to look at it a little bit more, but I'll let you know what I decide.

So in terms of settlement, I'm assuming, since you did have settlement discussions before, that you were pretty far apart.  Would it be helpful to be referred to the magistrate judge or to the court's mediation program, where we could actually get someone in the mediation program who has some trademark experience perhaps most likely.  Is that something that the parties would be open to at this point or later?  What are your thoughts on that, starting with plaintiffs' counsel.

MR. WASNOFSKI:  Yes, your Honor.  We did discuss this internally, Rob Carroll and I.  We both agree that this should be at some point referred to a magistrate judge if the parties don't otherwise reach a settlement on their own.  Plaintiffs

O4NVPORC

thought that the time to do so would be after the close of fact discovery, you know, maybe immediately after, within a week or two.  Defendant had proposed within 30 days of ruling on the motion to dismiss.  So there is agreement to ultimately speaking with a magistrate judge in due course.

THE COURT:  Mr. Carroll?

MR. CARROLL:  My view is that I think -- well, I think that magistrate judges are always among the most talented mediators; and I think referral to a magistrate judge would be extremely helpful and we would be happy to do it as soon as that's a possibility.  So I think the sooner the better.

THE COURT:  Okay.  All right.  So I'll let you know.

Anything else for today, Mr. Wasnofski?

MR. WASNOFSKI:  No, your Honor, other than we did serve discovery.  As a courtesy, we gave defendant's counsel a seven-day extension.  They asked for that.

And I just would like clarity.  I'm not sure of the timing when you'll get back to us that, you know, discovery is not currently stayed; and but for that extension, you know, we should proceed as if we're allowed to take discovery.

THE COURT:  I'm going to order it essentially administratively stayed until I rule on the motion to stay.  So it will be stayed just for now.  But I'll let you know soon.

Anything else?

MR. WASNOFSKI:  Thank you for clarity.

O4NVPORC

THE COURT:  Okay.

MR. CARROLL:  Nothing for defendant, your Honor.

Thank you.

THE COURT:  All right.  Thanks, everyone.

We're adjourned.  Have a good day.

                         *    *    *