UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PORTKEY TECHNOLOGIES PTE LTD,
*et al.*,

                              Plaintiffs,                         23-CV-5074 (JPO)

              -v-                                        OPINION AND ORDER

ANAND VENKATESWARAN,
                              Defendant.

J. PAUL OETKEN, District Judge:

        Plaintiffs Portkey Technologies Pte Ltd. ("Portkey") and Vignesh Sundaresan bring this

action against Defendant Anand Venkateswaran for unfair competition/reverse passing off, false

advertising, and trademark infringement under the Lanham Act, as well as related state-law

claims.  (ECF No. 22 ("FAC").)  Before the Court is Venkateswaran's motion to dismiss all

counts pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure and to dismiss Count VII

pursuant to Rule 12(b)(1).  (ECF No. 16.)  For the reasons that follow, Venkateswaran's motion

to dismiss is granted in part and denied in part.[1]

I.      **Background**

        A.      **Factual Background**

        The following facts, taken from the First Amended Complaint, are assumed true for the

purposes of this opinion.  *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Plaintiff Vignesh Sundaresan is the founder and sole proprietor of Plaintiff Portkey Technologies

---

[1] Sundaresan and Portkey sought leave to file a surreply in connection with the briefing
on this motion to dismiss.  (ECF No. 29.)  Surreplies "are not allowed . . . unless specifically
permitted in extraordinary situations for good cause."  Indiv. R. & Pracs. in Civ. Cases 2.B.
Because this is not such a situation, the motion for leave to file a surreply is denied.

Pte Ltd., which is a "software and technology company that operates many of Sundaresan's blockchain, NFT, and Web3 projects."  (FAC ¶ 18.)  Defendant Anand Venkateswaran worked as an independent contractor for Portkey from 2017 to 2022, during which Venkateswaran performed work in areas like "communications and public relations," "management of social media platforms," and "attending and representing in conferences."  (*Id.* ¶¶ 20, 63.)  During that time, Sundaresan directed Venkateswaran and others at the company to adopt the alias "TWOBADOUR" when communicating with the public.  (*Id.* ¶ 64.)  Sundaresan also directed Venkateswaran to "assist in the operation of METAPURSE," which is "a fund utilized for the acquisition of digital art NFTs and virtual land NDTs, and other Web3-related investments."  (*Id.* ¶¶ 20, 64.)  But five years in, in 2022, Sundaresan and Venkateswaran ended their professional relationship as a result of "rising tensions" between them.  (*Id.* ¶ 69.)  This dispute arises from Venkateswaran's alleged references to Portkey and its asserted trademarks since 2022.

Venkateswaran publicly lists his former work at Portkey—including use of the TWOBADOUR alias and involvement with METAPURSE—on his "bios" on Twitter and LinkedIn and has allegedly continued to associate himself with those projects in his public and private statements.  (*Id.* ¶¶ 71-84.)  Portkey and Sundaresan contend that such references are false and misleading and constitute unfair competition/reverse passing off, false advertising, and trademark infringement under Section 43(a) of the Lanham Act, 15 U.S.C. §§ 1125(a), as well as violations of related New York state laws.  (FAC ¶¶ 84-133.)  They also seek a declaratory judgment that TWOBADOUR and METAPURSE are, in fact, valid trademarks and that they hold exclusive rights in their use.  (*Id.* ¶¶ 134-41.)

### B.    Procedural Background

Defendant filed a motion to dismiss (ECF No. 16) and supporting memorandum (ECF No. 17 ("Mem.")) on October 30, 2023.   Plaintiffs filed a First Amended Complaint on

November 20, 2023.   On November 22, 2023, Defendant filed a letter with the Court explaining his intention to rely on the original motion to dismiss in response to the First Amended Complaint.  (ECF No. 25.)  Plaintiffs filed a memorandum in opposition to the motion to dismiss on December 1, 2023 (ECF No. 27 ("Mem. Op.")), and Defendant filed a reply to that memorandum in opposition on December 8, 2023.   (ECF No. 28 ("Reply").)  Plaintiffs then filed a letter seeking leave to file a surreply on December 15, 2023 (ECF No. 29), which Defendant opposed on December 18, 2023 (ECF No. 30).  On April 24, 2024, the Court administratively stayed discovery pending the resolution of the motion to dismiss.  (ECF No. 39.)

## II.    Legal Standards

### A.    Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A complaint need not contain "detailed factual allegations," but it must offer something "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 555).  In resolving a motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the complaint, "drawing all reasonable inferences in favor of the plaintiff."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

**B.      Rule 12(b)(1) Motion to Dismiss for Lack of Subject-Matter Jurisdiction**

Rule 12(b)(1) requires a claim be dismissed for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A plaintiff must allege facts establishing that subject matter jurisdiction exists.  *Lunney v. United States*, 319 F.3d 550, 554 (2d Cir. 2003).  "In a motion to dismiss [for lack of subject matter jurisdiction] pursuant to Fed. R. Civ. P. 12(b)(1), the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both."  *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001).

While a district court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks and citations omitted); *Ernst v. Gateway Plaza Mgmt. Corp.*, No. 11-CV-1169, 2012 WL 1438347, at *2 (S.D.N.Y. Mar. 14, 2012) ("In deciding jurisdictional issues, the court may rely on affidavits and other evidence outside the pleadings.").

## III.    Discussion

**A.      Trademark Infringement (Count III)**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides a right of action for unregistered trademark infringement.  To survive a motion to dismiss, a plaintiff must plausibly allege that the defendant (1) used a designation or false designation of origin; (2) in interstate commerce; (3) in connection with goods or services; (4) when the designation was likely to

cause confusion mistake, or deception as to the affiliation, connection, or association of the defendant with another person or the origin, sponsorship, or approval of the defendant's goods, services, or commercial activities by another person; and (5) that the plaintiff has been or is likely to be damaged by those acts.  4 McCarthy on Trademarks and Unfair Competition § 27:13 (5th ed.).  Importantly, Venkateswaran does not contend that TWOBADOUR and METAPURSE are not valid trademarks.  (Mem. at 7-12.)  Instead, Venkateswaran argues that the trademark infringement claim fails as a matter of law because "there is no likelihood of confusion from reference to former positions," that the alleged statements were not used in commerce, and that the statements constitute "nominative" or "descriptive fair use."  (*Id.*)  Without passing on the ultimate merits of any of Venkateswaran's arguments, Sundaresan and Portkey have alleged a sufficient factual basis to survive a motion to dismiss on the Section 43(a) trademark infringement claim.

### 1. Likelihood of Confusion

"Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that . . . the defendant's 'actions are likely to cause confusion with [that] mark.'" *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (quoting *The Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir. 1996)).  The Second Circuit has held "repeatedly" that district courts are to consider the eight *Polaroid* factors when evaluating a Lanham Act trademark infringement claim.  *See Int'l Info. Sys. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 165 (2d Cir. 2016).  The "nonexclusive" factors are:

> (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.

*Id.* at 165 (quoting *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).

"The steady application of *Polaroid* is critical to the proper development of trademark law, for it is only when the *Polaroid* factors are applied consistently and clearly over time that the relevant distinctions between different factual configurations can emerge." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 400 (2d Cir. 1995). Thus, district courts are to analyze each factor individually. *See Int'l Info.*, 823 F.3d at 165 (instructing district courts to consider every *Polaroid* factor "even 'where a factor is irrelevant to the facts at hand'") (quoting *Arrow Fastener*, 59 F.3d at 400). And where, as here, the defendant argues that their use of the plaintiff's mark constituted "nominative fair use," courts are to consider three additional factors to assess the likelihood of confusion. *Id.* at 168; *see also Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 379-80 (S.D.N.Y. 2019) (considering the eight *Polaroid* factors and the three *International Information* factors in a nominative fair use case).

But before even reaching *Polaroid*, Venkateswaran contends that such an analysis is unnecessary, since "Plaintiffs have pleaded no plausible basis for any consumer confusion here based on Mr. Venkateswaran's accurate representation in personal materials." (Mem. at 14). "Normally, the likelihood of confusion is a factual question, centering on the probable reactions of prospective purchasers of the parties' goods." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990). That is because the *Polaroid* test concerns questions about the strength of the mark, the degree of similarity of the works, any actual confusion, the defendant's good faith, and buyer sophistication, among others. *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Venkateswaran is correct that courts occasionally dismiss at this stage claims of trademark infringement if "the court is satisfied that the products or marks are so dissimilar that

no question of fact is presented." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d. Cir. 1990)

(quoting *Universal City Studios, Inc. v. Nintendo Co. Ltd.*, 746 F.2d 112, 116 (2d Cir. 1984)).

But such dismissals are rare and typically for reasons that are not present here, such as clear

parody or a total absence of proximity between the marks.  *See, e.g.*, *Roberts v. Bliss*, 229 F.

Supp. 3d 240, 251-53 (S.D.N.Y. 2017) (granting a motion to dismiss a Lanham Act trademark

infringement claim because the defendant's use of the plaintiff's mark was an "obvious"

parody); *Champion v. Moda Operandi, Inc.*, 561 F. Supp. 3d 419, 436-39 (S.D.N.Y. 2021)

(dismissing a Lanham Act claim alleging likely confusion between a fashion website's hyperlink

to a shopping website because the shopping website's mark "appears nowhere on the screens

containing plaintiffs' images"); *Louis Vuitton Malletier S.A. v. Warner Bros. Entertainment, Inc.*,

868 F. Supp. 2d 172, 178 (S.D.N.Y. 2012) (dismissing a Lanham Act claim based on the use of

the plaintiff's mark in a humorous movie scene under the *Rogers* test where there was "no

indication that [the] use was commercially motivated"); *Gottlieb Development LLC v.

Paramount Pictures Corp.*, 590 F. Supp. 2d 635, 634-635 (S.D.N.Y. 2008) (granting a motion to

dismiss a trademark infringement claim based on use of a mark in a film because "it would be

difficult for even a keen observer to pick out Gottlieb's trademark, as it appears in the

background of the scene").

　　　　This case differs in meaningful ways from *Roberts*, *Champion*, *Louis Vuitton*, and

*Gottlieb*, where the allegedly infringing use was fleeting or far separated from the protected

mark.  Here, the marks in question were used at the top of Venkateswaran's public profiles,

directly proximate to his current business ventures.  Sometimes Venkateswaran noted a past

affiliation with TWOBADOUR and METAPURSE, but other times he did not.  And sometimes

he used terms that may still lend themselves to confusion (such as abbreviating "Former" into

"Fmr").  For example, the First Amended Complaint alleges that Venkateswaran included on LinkedIn that he was the "Fmr Steward of Metapurse," but then simply "Creator of the @Twobadour pseudonym."  (FAC ¶ 80.)  Even if Venkateswaran is correct that an indication of former affiliation is not likely confusing as a matter of law, that would not shield the alleged reference to the TWOBADOUR mark, which at least on LinkedIn lacks an indication that the affiliation had ended.  (*Id.*)

Moreover, to hold that any indication of non-affiliation defeats an infringement claim *as a matter of law* would contravene the Supreme Court's recent approach in *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, in which the defendant had sold a dog toy mimicking a bottle of Jack Daniel's.  599 U.S. 140, 144 (2023).  There, the Court did not find it dispositive that the allegedly infringing product had at the bottom "a disclaimer" that "[the] product is not affiliated with" the plaintiff's business, but instead proceeded through a full analysis of the likelihood of confusion.  *Id.* at 150.  It still may be that some disclaimers or other explicit indications of non-affiliation will be enough to render consumer confusion unlikely, but whether that is true in this case will depend on facts not yet before the Court.

Because the Court cannot conclude as a matter of law that Venkateswaran did not infringe Sundaresan's and Portkey's asserted trademarks merely from looking at the alleged references, a *Polaroid* analysis is warranted.

### a.    Strength of the Trademark

A mark's "strength refers to [its] tendency to identify the goods sold under the mark as emanating from a particular . . . source."  *Arrow Fastener*, 59 F.3d at 391 (internal quotation marks omitted).  That in turn "depends on whether the mark is generic, descriptive, suggestive, arbitrary or fanciful."  *Id.*  While generic terms are entitled to no trademark protection and

merely descriptive terms are entitled to little, "at the opposite end of the distinctiveness array is an arbitrary or a fanciful term," the latter of which is "made-up." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1075-76 (2d Cir. 1993). The parties do not discuss into which category TWOBADOUR and METAPURSE should fall. However, in this Circuit, so long as a mark is not generic or merely descriptive of the good or service to which it relates, it may be protected as a valid trademark regardless of whether it has acquired a secondary meaning among the consuming public. *Arrow Fastener*, 59 F.3d at 391.

Here, Sundaresan and Portkey allege that TWOBADOUR and METAPURSE are "inherently distinctive trademark[s] with significant renown among the public." (FAC ¶¶ 42, 55). Moreover, they allege that "Portkey's METAPURSE fund . . . received wide media attention, cementing its reputation as a leading fund involved in NFT investing," and that "[b]y association, other Portkey projects and investments became more notable and publicized." (*Id.* at ¶ 34, 35; Mem. Opp. at 5.) Those facts, taken to be true, along with a review of the marks themselves, are sufficient for the "strength of the mark" to weigh in favor of likely confusion for the purposes of resolving this motion.

### b.    Similarity of the Marks

Consideration of two marks' similarity "begins with the words of the marks." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 330 (2d Cir. 2020). In *Car-Freshner*, the Second Circuit considered two competing marks for air fresheners—"Black Ice" and "Midnight Black Ice Storm"—and found the similarity factor to weigh "moderately in favor" of confusion. *Id.* at 330-32. Of particular relevance here, the Second Circuit determined that even though the two products bearing the marks exhibited "differences in packaging," that fact did not "dispel[]

the similarity of a mark that used . . . identical words." *Id.* at 331.  In its earlier case *The Sports Authority, Inc. v. Prime Hospitality Corp.*, the Second Circuit emphasized a broader range of considerations, including "not . . . just . . . the typewritten and aural similarity of the marks, but how they are presented in the marketplace."  89 F.3d at 962.  But even in that case, it was significant that "the parties' marks [were] *identical*," and thus the factor—even where some context made it easier to distinguish the marks—weighed in favor of confusion.  *Id.* at 962-63.

Here, as in *Sports Authority* and even more than in *Car-Freshner*, Sundaresan and Portkey allege that Venkateswaran repeatedly referenced TWOBADOUR and METAPURSE letter-for-letter.  (FAC ¶ 80.)  The only caveat, and the subject of much disagreement between the parties, is whether the addition of words indicating former affiliation renders the marks so dissimilar as to negate any plausible inference of causing confusion.  Venkateswaran contends that it does, for two reasons: first, because the references indicate that they describe only Venkateswaran's *former* affiliations; and second, because the references are accompanied by statements of his *current* affiliations.  (Mem. at 11-12.)  Though not couched in the terms of similarity, arguments about explicit indications of non-affiliation go to similarity.  *Cf. Sports Auth.*, 89 F.3d at 963 (considering the defendant's argument that it included its own name alongside the allegedly infringing mark under the similarity factor and still finding that the factor weighed in favor of confusion because the defendant "failed to cite any evidence of widespread advertising of its full logo").  Because the text of the alleged marks and the phrases used by Venkateswaran are identical and an issue of disputed fact exists as to how much inclusion of words like "former" or "fmr" render them dissimilar, Sundaresan and Portkey have made sufficiently plausible allegations such that this factor weighs in favor of confusion.

### c. Proximity of the Products and Their Competitiveness with Each Other

Where two products "directly compete with each other," the proximity factor weighs in favor of confusion. *Car-Freshner*, 980 F.3d at 332. But "direct competition between the products is not a prerequisite to relief," *Sports Auth.*, 89 F.3d at 963 (quoting *Arrow Fastener*, 59 F.3d at 396), just as "products that share the same channel of trade are not necessarily proximate." *Id.* (citing *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993). In *Sports Authority*, the Second Circuit held that while the parties were both "attempting to reach the same market of sports aficionados and . . . using at least one advertising medium simultaneously," "the parties' services—restaurants and sporting goods stores—are sufficiently different that . . . a trier of fact would have to find that the factor weighs against confusion." *Id.*

This case is different. Not only are the parties trying to reach the same "aficionados" through "public interviews," "Twitter," "LinkedIn," and "blog" (FAC ¶ 74), but they are also alleged to be competing directly, since Venkateswaran "sought to promote his own businesses, including . . . eDAO and Layer-E, which operate in the same space as Portkey and have focused on selling NFTs to the public and providing a residency for Web3 artists, respectively." (*Id.* ¶ 75.) The two products at issue allegedly "serve the same purpose, fall within the same general class, or are used together . . . ." *W.W.W. Pharm.*, 984 F.2d at 573 (quoting *C.L.A.S.S. Promotions, Inc. v. D.S. Mags., Inc.*, 753 F.2d 14, 18 (2d Cir. 1985)). To the extent that there are subtle differences between the services that Venkateswaran offers and those of Sundaresan and Portkey, they are subject of factual inquiry not proper at the motion to dismiss stage.

### d. Bridging the Gap

The fourth *Polaroid* factor concerns "evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product." *Int'l Info.*, 823

F.3d at 160 (quoting *Starbucks Corp.*, 588 F.3d at 115).  However, where "the parties' products are already in the same market," "the bridging-the-gap factor is irrelevant."  *Car-Freshner*, 980 F.3d at 332.  That is the case here, for the reasons stated under the third factor.

### e.    Actual Confusion

Evidence of actual consumer confusion weighs in favor of a trademark infringement plaintiff.  *Id.* at 332 ("[E]vidence of actual confusion is very helpful to an infringement claimant . . . .").  But "its absence is not fatal."  *Id.* (citing *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d Cir. 1988); *Arrow Fastener*, 59 F.3d at 387 ("[T]he absence of actual confusion alone is not dispositive of the question of likelihood of confusion.").

Here, Sundaresan and Portkey have not made a plausible showing of actual confusion. Instead, they allege the bare bones of confusion.  For example:

- "Defendant's unauthorized use of the TWOBADOUR and METAPURSE trademarks is likely to cause consumer confusion, mistake, and/or deception in the relevant markets(s)."  (FAC ¶ 121.)

- "[A]s a result of Defendant's false and misleading statements, people turn to Defendant for business opportunities, believing that he is or was responsible for Plaintiffs' business operations and success."  (*Id*. ¶ 96.)

Those allegations are merely "a formulaic recitation of the elements" of actual confusion. *Iqbal*, 556 U.S. at 678.  Plaintiffs do not allege the type of business lost to Defendant, an indication of the volume of sales lost, or the participants in the market in which Plaintiffs and Defendant are competing.  Adding the generic terms "opportunities," "operations," and "success" does not render Plaintiffs' allegations any less conclusory.  Even taking the allegations

in the First Amended Complaint as true, the actual confusion factor weighs against a finding of infringement.

                    **f.**       **Good Faith**

"This factor considers 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" *Arrow Fastener*, 59 F.3d at 397 (quoting *Lang v. Ret. Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991). This is a heavily fact-intensive inquiry that requires investigating the defendant's state of mind and actions before referencing an asserted mark. For example, "[g]ood faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *W.W.W. Pharm.*, 984 F.2d at 575 (citing *E.S. Originals Inc. v. Stride Rite Corp.*, 656 F. Supp. 484, 490 (S.D.N.Y. 1987).

Here, Sundaresan and Portkey allege repeatedly that Venkateswaran referenced TWOBADOUR and METAPURSE despite having "actual knowledge that Plaintiffs own all rights, title, and interest in the trademark METAPURSE," and that such references "have been willful, wanton, and in bad faith, and with intent to misrepresent Plaintiff's business operations and successes as that of his own." (FAC ¶¶ 91-93.) The First Amended Complaint further alleges that Venkateswaran "is attempting to exploit Plaintiff's reputations and intellectual property to intentionally cause confusion among investors, artists, artist estates, trade conference organizers and organizations, scholars, publishers, and other market participants, hoping people choose to do business with him and his associated businesses, mistakenly believing that . . . he remains associated with Plaintiffs and their business." (*Id.* ¶ 94.) Taking these allegations as

true, the Court concludes that they are sufficient for this factor, at the motion to dismiss stage, to weigh in favor of confusion.

### g.  Quality of Defendant's Product and Sophistication of Consumers

The final two factors are the quality of the defendant's product and the sophistication of consumers in the parties' market.  Where a senior trademark holder's "reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality," there is more likely to be consumer confusion.  *Arrow Fastener*, 59 F.3d at 398.  Likewise, the more sophisticated a buyer in the relevant market, the less likely they are to be confused by the defendant's use of or reference to the plaintiff's mark.  *See W.W.W. Pharm.*, 984 F.2d at 575-76; *Arrow Fasteners*, 59 F.3d at 398-99.

None of the parties' pleadings creates an inference about the quality of Venkateswaran's goods or services, nor do they indicate whether consumers in the relevant market are particularly sophisticated or susceptible to confusion.  At this stage, the final two factors are irrelevant.

### h.  Nominative Fair Use

Venkateswaran also argues that his references to TWOBADOUR and METAPURSE constitute "nominative fair use," and thus "plaintiffs have not sufficiently pleaded likelihood of confusion."  (Mem. at 12.)  Nominative fair use entails "use of another's trademark to identify, not the defendant's goods or services, but the plaintiff's goods or services."  *Int'l Info.*, 823 F.3d at 165 (quoting 4 McCarthy on Trademarks and Unfair Competition § 23:11 (5th ed.)). Nominative fair use "allows a defendant to use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of the defendant's product or the mark-holder's sponsorship or affiliation."  *Id.* (quoting *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010)).  Unlike descriptive fair use, nominative fair use is not an

affirmative defense to trademark infringement in the Second Circuit. *Id.* at 167-68. Instead, nominative fair use is shorthand for a particular way the use of one trademark might not be likely to cause consumer confusion: where the defendant merely references another's goods or services without implying an affiliation or endorsement by virtue of the plaintiff's mark. *Id.*

The Second Circuit's test for nominative fair use instructs district courts to consider, in addition to the *Polaroid* factors:

> (1) whether the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service, that is, whether the product or service is not readily identifiable without use of the mark; (2) whether the defendant uses only so much of the plaintiff's mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder, that is, whether the defendant's conduct or language reflects the true or accurate relationship between plaintiff's and defendant's products or services.

*Id.* at 168. Like the *Polaroid* inquiry, however, the nominative fair use defense is often heavily factual and thus ill-suited for the motion-to-dismiss stage. Most notably, "the third element of the nominative fair use defenses requires that the use of the trademark not create a likelihood of confusion as to the mark-holder's sponsorship, endorsement, or affiliation . . . the existence of [which] necessitates focusing on 'the minds of the relevant purchasers—an analysis based on a factual inquiry inappropriate to a motion to dismiss.'" *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 414 (S.D.N.Y. 2006) (internal citations omitted).

Here, Sundaresan and Portkey make factual allegations about the location and format of Venkateswaran's references to TWOBADOUR and METAPURSE that, taken as true for the purpose of resolving this motion, raise the possibility that a consumer could be confused about Venkateswaran's current affiliations due to their similarity. The First Amended Complaint alleges that Venkateswaran described himself on LinkedIn as "Fmr steward of Metapurse" and "Creator of the @Twobadour pseudonym." (FAC ¶ 80.) It also alleges that on Twitter,

Venkateswaran wrote of himself: "As @twobadour, Steward of @metapurse, won the $69m @BEEPLE auction." (*Id.*) The complaint also includes photographs of the LinkedIn and Twitter statements. (*Id.*) Sundaresan and Portkey argue that the inclusion of references and hyperlinks to TWOBADOUR and METAPURSE "at the very top of [Venkateswaran's] LinkedIn and Twitter bios," including "display[ing] the two marks in his Twitter profile in a distinguishing color," "certainly invites confusion as to source, affiliation, sponsorship, and endorsement." (Mem. Opp. at 20-21.) And, of course, all of the foregoing analysis under *Polaroid* further illustrates that the First Amended Complaint alleges a sufficient factual basis for confusion to survive a motion to dismiss. Similarly, the degree to which Venkateswaran needed to reference TWOBADOUR and METAPURSE—another issue hotly contested by the parties— is primarily factual and not appropriate for consideration at this stage.

Venkateswaran relies primarily on *Weight Watchers Int'l Inc. v. Noom, Inc.*, a case from this District in which the court dismissed Lanham Act trademark infringement claims because the reference to the plaintiff's mark was nominative fair use. 403 F. Supp. 3d 361, 377-380 (S.D.N.Y. 2019). Following the Second Circuit's *International Information* approach, Judge Castel proceeded through the eight *Polaroid* factors before considering whether the alleged reference was nominative fair use. But the allegations in *Weight Watchers* were meaningfully different from those here, primarily because the defendant was accused of publishing an advertisement directly criticizing the plaintiff's business by making use of the plaintiff's trademark. As the court explained in summarizing the third factor: "the ads do not suggest that [the plaintiff] has endorsed or sponsored [the defendant's product]: they assert that [it] is a *different and modern alternative* . . . ." *Id.* at 380 (emphasis added). Here, Plaintiffs allege that Venkateswaran included references to TWOBADOUR and METAPURSE proudly, with no

criticism or comparison to his own business.  The difference between *Weight Watchers* and this case underscores the factual nature of the claim that renders dismissal at this stage premature. While no reasonable consumer could confuse the degree of association between one producer's *criticism* of another, here there is an allegation that a much more ambiguous reference to another's trademark creates a likelihood of confusion.  That is sufficient to warrant denial of a motion to dismiss a trademark infringement claim.

Thus, as for the *Polaroid* factors, all but actual confusion weighs in favor of permitting the trademark infringement claim to proceed or are irrelevant.  And actual confusion itself is not required to state such a claim.  Because of that, and because Venkateswaran has not satisfied the elements of nominative fair use as a matter of law, the Court concludes that Sundaresan and Portkey have plausibly pleaded a likelihood of consumer confusion.

### 2.    Use in Commerce

To be actionable under Section 43(a), alleged trademark infringement must also occur "in commerce"[2] and "in connection with any goods or services."  15 U.S.C. § 1125(a).  "The term 'services' has been interpreted broadly," and has "been applied to defendants furnishing a wide variety of non-commercial public and civic benefits."  *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86, 89-90 (2d Cir. 1997).  In *United We Stand*, the

---

[2] As the Second Circuit explained in *United We Stand America, Inc. v. United We Stand, America New York, Inc.*, 128 F.3d 86 (2d Cir. 1997), the requirement that the use of the mark be "in commerce" is primarily jurisdictional, and does not demand that the use be commercial or for profit.  *See id.* at 92-93 ("It appears that 'use in commerce' denotes Congress's authority under the Commerce Clause rather than an intent to limit the Act's application to profitmaking activity.").  Venkateswaran does not argue that Sundaresan and Portkey have failed to allege facts that bring the relevant usages—including on public internet pages—within the reach of the Commerce Clause.  *Cf. United States v. Le*, 902 F.3d 104, 112 (2d Cir. 2018) (holding the use of the internet has been "routinely recognized by this court as an instrumentality of interstate commerce").  Thus, it makes sense to consider the remainder of their arguments as challenging the "goods or services" element of a Section 43(a) claim.

Second Circuit considered whether the use of one political organization's trademark by another could constitute actionable infringement under the Lanham Act. *Id.* at 88. The court cited with approval cases permitting claims based on uses connected to "soliciting donations," "holding public meetings," and "dissemination of information about environmental causes." *Id.* at 90. And in that case, the court held that even though the defendant's activities were "not undertaken for profit, they unquestionably render a service"—that of political organizing "to and for its members, adherents, and candidates." *Id.* The suggestion to the contrary—"that the performance of such functions is not within the scope of 'services in commerce'"—seemed to the court "to be not only wrong but extraordinarily impractical for the functioning of our political system." *Id.* The court also explicitly rejected the notion that "not [being] engaged in selling anything but ideas" removes the use of protected marks from the auspices of the Lanham Act. *Id.* at 91. Put another way, marketing one's ideas on a public topic, even if not for the sake of entering a transaction, may constitute "connection with . . . services" for the purposes of Section 43(a).

Venkateswaran contends that he was "not promoting *any* goods or services . . . ." (Mem. at 10) (emphasis in original). Sundaresan and Portkey allege instead that LinkedIn "is the world's largest professional network on the internet," that it is "used by individuals to develop professional opportunities and to strength professional networks and relationships," and that Venkateswaran also referenced the marks in "promotional blogs, videos, publications, conferences and events." (FAC ¶ 82.) Moreover, Sundaresan and Portkey argue that Venkateswaran's references to TWOBADOUR and METAPURSE were "made in connection with Defendant's efforts to build business ventures and relationships solely for Defendant's benefit, including ventures that compete with Portkey in the NFT, blockchain, and Web3

industries. (Mem. Opp. at 17.) In other words, Sundaresan and Portkey have plausibly alleged that Venkateswaran used their trademarks in public communications in which Venkateswaran also highlighted his own business ventures and promoted his role in a competitive industry. Consistent with the expansive approach taken by the Second Circuit in *United We Stand*, Sundaresan and Portkey have alleged sufficient facts to sustain a finding that Venkateswaran's references to TWOBADOUR and METAPURSE were made "in connection with . . . goods or services."

### 3.  Descriptive Fair Use

Notwithstanding the elements of a Section 43(a) claim, Venkateswaran contends that his reference to TWOBADOUR and METAPURSE constitutes "descriptive fair use." (Mem. at 14-15.) "To come within the [descriptive] fair use defense[], defendants must have made use of [a trademark] (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. *EMI Catalogue P'Ship v. Hill, Holliday, Connors, Cosmopolus, Inc.*, 228 F.3d 56, 64 (2d Cir. 2000) (citing 15 U.S.C. § 1115(b)(4)). The defense exists because "the owner's rights in a mark extend only to its significance as an identifying source, not to the original descriptive meanings of a mark . . . ." *Id.* Correspondingly, the defense "protects the right of society at large to use words or images in their primary descriptive sense . . . ." *Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 275 (2d Cir. 2024) (affirming summary judgment dismissing a Section 43(a) claim arising from a defendant's use of the trademarked term "red gold" to refer to items of that color). But that also means that the fair use inquiry is a necessarily difficult and factual one, turning on the "manner in which the mark is used with respect to the product or service sold by the alleged infringer." *EMI Catalogue P'Ship*, 228 F.3d at 65. For example, as to the third requirement, "[a]ny evidence that is probative of intent to trade on the protected mark would be relevant to the good faith inquiry, including whether the defendant used a term reflecting the product's

characteristics and whether the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks." *Solid 21*, 96 F.4th at 278 (internal citations, quotation marks, and brackets omitted). In this way, "fair use . . . often requires consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to dismiss. *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308, 313 (2d Cir. 2013) (reversing a district court's dismissal of a Section 43(a) claim on descriptive fair use grounds because "[o]ur role in considering a motion to dismiss is not to resolve these sorts of factual disputes").

For the reasons already discussed above concerning the good faith inquiry under *Polaroid*, Sundaresan and Portkey have met the low burden of pleading plausible allegations that Venkateswaran's references to TWOBADOUR and METAPURSE were made in bad faith and thus cannot constitute descriptive fair use. (*See* FAC ¶¶ 91-92, 94.)

Thus, the Court concludes that the First Amended Complaint does state a claim for trademark infringement under Section 43(a).

## B.    Unfair Competition/Reverse Passing Off, Section 43(a) (Count I)

Count I pleads a violation of Section 43(a) of the Lanham Act in the form of "unfair competition/reverse passing off." (FAC ¶¶ 99-105.) The thrust of Lanham Act reverse passing off is marketing another's goods or services under one's own brand. "Specifically, a reverse palming off claim requires allegations: '(1) that the [product] at issue originated with the plaintiff; (2) that [the] origin of the [product] was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.'" *Societe Des Hotels Meridien v. LaSalle Hotel Operating Partnership, L.P.*, 380 F.3d 126, 131 (2d Cir. 2004). Though Plaintiffs' allegations are sparse on this Count, their theory appears to be that because Venkateswaran allegedly represented to the public that he was more involved with the creation and management

of TWOBADOUR and METAPURSE than he actually was, he has "passed off" the goods and services sold under those marks as his own. Consistent with that theory, Sundaresan and Portkey's claims require a Section 43(a) action for false "origin" to cover prior involvement in the creation and promotion of a trademark.

It does not. The Supreme Court rejected such a broad interpretation of Section 43(a) in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, holding that the provision does not "require attribution of uncopyrighted materials . . . ." 539 U.S. 23, 35 (2003). Unlike other forms of intellectual property protection, the Lanham Act does not extend protection to "any idea, concept, or communication embodied in" goods or services. *Id.* at 37. "To hold otherwise would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do." *Id.*; *see also Hermès Int'l v. Rothschild*, 590 F. Supp. 3d 647, 655 (S.D.N.Y. 2022) ("[C]ourts . . . draw a sharp[] distinction between copyright and trademark by requiring consumer confusion as to the defendant's goods—whether tangible or intangible— rather than with respect to their creative content."). As another judge in our sibling district summarized recently, "the Supreme Court made clear in *Dastar* that who *designed* the goods is irrelevant to who originated them for purposes of a reverse passing off claim under the Lanham Act." *DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 415 (E.D.N.Y. 2021) (emphasis added).

Sundaresan's and Portkey's allegations elsewhere in the complaint that consumers will be confused into believing there is an ongoing association between the parties also directly undercut any claim of reverse passing off. The Supreme Court highlighted this very tension when it rejected a broad interpretation of "origin" in *Dastar*, explaining: "[A] practical difficulty of adopting a special definition of 'origin' for communicative products is that it places the manufacturers of those products in a difficult position. On the one hand, they would face

Lanham Act liability for failing to credit the creator of a work on which their lawful copies are based; and on the other hand they could face Lanham Act liability for crediting the creator if that should be regarded as implying the creator's "sponsorship or approval" of the copy . . . ." *Id.* at 36.

To the extent that Sundaresan and Portkey allege that Venkateswaran's statements create the impression of association with the asserted trademarks and thus raise the possibility of consumer confusion, they have pleaded a claim for trademark infringement, not "reverse passing off." Thus, Plaintiffs fail to state a claim for unfair competition/reverse passing off under Section 43(a).

### C.    False Advertising, Section 43(a) (Count II)

To prevail on a Section 43(a) false advertising claim, a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). "[T]he classic Lanham Act false-advertising claim" is one in which "one competitor directly injures another by making false statements about his own goods or the competitor's goods and thus induc[es] customers to switch." *Id.* at 137 (quoting *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 799 n.4 (5th Cir. 2011)) (cleaned up).

Generally, "the likelihood of injury and causation will not be presumed, but must be demonstrated in some manner," unless the plaintiff plausibly alleges that the defendant's "comparative advertisement" is "literally false" and "mentions the plaintiff's product by name." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007) (considering the false-advertising standard in an appeal of the grant of a preliminary injunction). Where there is no allegation of a *comparative* advertisement, the Lanham Act requires "some affirmative

indication of actual injury and causation." *Souza v. Exotic Island Enterprises, Inc.*, 68 F.3d 99, 119 (2d Cir. 2023). In *Time Warner Cable*, the comparative advertisement was a "derogatory statement" that "explicitly disparage[d]" the plaintiff's product. *Id.* (noting that the defendant's advertisement "necessarily diminish[ed]" the value of the plaintiff's product "in the minds of the consumer"). Plaintiffs have not pleaded plausible allegations of either a comparative advertisement or an actual diversion in sales.

Though Sundaresan and Portkey allege that Venkateswaran made misleading statements about his time at Portkey, they do not plausibly allege a "literally false" statement. Paragraph 111 of the First Amended Complaint—which reads, "Defendant's statements were literally false and/or implicitly false"—merely recites the blackletter prerequisite for a presumption of injury under the Lanham Act. Plaintiffs' other allegations concerning false statements do not plead literal falsity, but instead various shades of untruthfulness or ambiguity, such as the degree of Venkateswaran's involvement in the METAPURSE acquisition of an NFT (FAC ¶72) and the degree that others also communicated under the alias "TWOBADOUR." (FAC ¶80.) Illustrative are the allegations in paragraph 72 of the First Amended Complaint. Though the list of alleged statements are purported to be "false and misleading," none alleges an objectively incorrect statement of fact, only a subjective disagreement among the parties concerning the degree of Venkateswaran's prior involvement with the business. Because those allegations do not make out a plausible claim of a literally false comparative advertisement, Sundaresan and Portkey must instead plead a direct economic or reputational injury.

They do not. Most significantly, Plaintiffs do not allege that association with Defendant or Defendant's statements—taken to be false for the purpose of considering the motion to dismiss—have caused reputational damage to Portkey. Unlike in *Time Warner Cable*, there is no

allegation of a "derogatory" or "disparag[ing]" statement about Portkey that would make a consumer hesitate before doing business with Portkey.  Thus, the Court concludes that the First Amended Complaint does not state a claim for false advertising under Section 43(a).

### D.    Deceptive Acts and Practices, N.Y. Gen. Bus. Law § 349 (Count IV)

New York law provides a cause of action for "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."  N.Y. Gen. Bus. L. § 349(a).  "To successfully assert a claim under General Business Law § 349(h) . . . , 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  *Koch v. Acker, Merrall & Condit. Co.*, 18 N.Y.3d 940, 941 (2012) (quoting *City of New York v. Smokes-Spirits.Com, Inc.*, 12 N.Y.3d 616, 621 (2009)); *see also Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).[3]  "The standards for bringing a claim under § 43(a) of the Lanham Act are substantially the same as those applied to claims brought under . . . [§] 349."  *Casper Sleep, Inc. v. Nectar Brand LLC*, No. 18-CV-4459, 2020 WL

---

[3] In a pair of cases, the New York Court of Appeals limited the class of plaintiffs that may bring § 349 claims, rejecting "derivative" standing.  *See Smokes-Spirits*, 12 N.Y.3d 616 (requiring plaintiffs to "demonstrate that the complained-of acts or practices 'have a broader impact on consumers at large'"); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 3 N.Y.3d 200 (2004) (rejecting a claim by a health insurance company against a cigarette manufacturer for false advertising resulting in increased costs to the health insurance company as "too remote").  More recent cases have narrowed the scope of those rulings.  For example, in *North State Autobahn, Inc. v. Progressive Ins. Group Co.*, the Appellate Division permitted a § 349 claim to proceed alleging injury in the form of "deceptive conduct . . . specifically targeted at the plaintiffs . . . in an effort to wrest away customers through false and misleading statements."  953 N.Y.S.2d 96, 105 (2d Dep't 2012).  The Appellate Division explained: "Affording a business standing to challenge deceptive conduct practiced in favor of a competing business is consistent with the legislative history of the 1980 amendments, which, as the Court of Appeals has repeatedly recognized, 'support[s] the position that business competitors have standing under the statute.'"  *Id.*  However, the Court need not consider whether the injury alleged here qualifies as "derivative" for the purposes of § 349, as Venkateswaran has made no such argument.

5659581 (S.D.N.Y. Sept. 23, 2020) (quoting *Avod Prod., Inc. v. S.C. Johnson & Son, Inc.*, 984 F. Supp. 768, 800 (S.D.N.Y. 1997).  That is significant, because to fall within § 349, a claim "must threaten an injury 'to the public interest over and above ordinary trademark infringement or dilution.'"  *Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 412 (S.D.N.Y. 2018) (quoting *Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, No. 07-CV-6959, 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009)).  Thus, "courts in New York have routinely dismissed trademark claims brought under [§ 349] . . . as being outside the scope of the statute[], because ordinary trademark disputes do not 'pose a significant risk of harm to the public health or interest' and are therefore not the type of deceptive conduct that the statutes were designed to address.'"  *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) (collecting cases).

Venkateswaran argues correctly that Sundaresan's and Portkey's § 349 claim is insufficient because it "fail[s] to allege harm to consumers beyond trademark confusion and unfair competition."  (Mem. at 22.)  As was the issue with the non-trademark Lanham Act claims, Sundaresan and Portkey do not allege a plausible injury to their reputation or to consumers—or even a theory of any such injury—beyond consumer confusion.  For example, Sundaresan and Portkey do not allege that Venkateswaran offers an inferior product or that he is harmful to their reputation.  Because "[t]he alleged deceptive acts . . . of the defendants in this case are precisely the acts that constitute the alleged trademark infringement, which are outside the scope of the statute[]," "the Section 349 . . . claim[] fail[s] as a matter of law, and the . . . motion to dismiss should be granted."  *Kaplan*, 16 F. Supp. 3d at 352-53 (internal citation and quotation marks omitted).

### E.    Injury to Business Reputation and Dilution, N.Y. Gen. Bus. Law § 360-*l* (Count V)

New York law also provides a right of action for injunctive relief to remedy a "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark of trade name . . . notwithstanding the absence of competition between the parties or absence of confusion as to the source of goods or services." N.Y. Gen. Bus. L. § 360-*l*. The statute has been interpreted in this Circuit to "provide for protection against both dilution by blurring and tarnishment." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). For reasons that have already been stated, Sundaresan and Portkey have not plausibly alleged any damage to their reputation or tarnishment of their marks as a result of Venkateswaran's statements. So, to prevail on a § 360-*l* claim, Sundaresan and Portkey must instead plead blurring, which in this Circuit is determined with reference to six factors: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *Starbucks*, 588 F.3d at 114 (quoting *New York Stock Exchange, Inc. v. New York, New York Hotel LLC*, 293 F.3d 500, 558 (2d Cir. 2002)). At the motion to dismiss stage, the Court takes the factual allegations in the First Amended Complaint to be true, asking merely whether Plaintiffs have made a plausible case for blurring under New York state law. Many of the factors mirror the likelihood of confusion analysis. For example, the Court has already concluded that Plaintiffs plausibly allege that the marks are very similar, if not identical; that all of the parties are engaged in selling similar and competing products; and that TWOBADOUR and METAPURSE are well-known trademarks within the market. All three of those factors weigh against dismissing a dilution claim at this stage. Moreover, as to predatory intent, the First Amended Complaint repeatedly pleads that Venkateswaran acted with hostility to

Sundaresan's and Portkey's marks. (*See, e.g.*, FAC ¶¶ 75, 93, 94.) That also weighs against dismissal. Thus, four of the six factors weigh in favor of a plausible allegation of blurring. Two other factors—relating to the sophistication of the consumers in the market and the renown of the junior mark—have not yet been developed by the parties. No factor weighs in favor of a dismissal at this stage. Thus, the Court concludes that the First Amended Complaint does state a claim for injury to business reputation and dilution under § 360-*l*.

### F.    Common Law Trademark Infringement and Unfair Competition (Count VI)

New York common law, like the Lanham Act, provides a cause of action for trademark infringement. "It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 250 (S.D.N.Y. 2018) (quoting *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005). But common law unfair competition requires, beyond the Lanham Act claim, "an additional showing of bad faith," such that "plaintiffs must combine their evidence supporting liability under the Lanham Act with additional evidence demonstrating that defendants acted in bad faith." *Id.* (internal quotation marks removed). Because the Court has already determined that Sundaresan and Portkey have made plausible allegations of both trademark infringement under the Lanham Act and bad faith on the part of Venkateswaran, the First Amended Complaint states a claim for trademark infringement under New York state law.

### G.    Declaratory Relief (Count VII)

Finally, Sundaresan and Portkey request declaratory relief under 28 U.S.C. § 2201-02 declaring that they, and not Venkateswaran, hold "exclusive rights to and ownership of" TWOBADOUR and METAPURSE trademarks. (FAC ¶¶ 140-41.) Venkateswaran counters that this Court either lacks jurisdiction entirely to entertain such an action, "because there is no case

or controversy concerning ownership of Plaintiff's trademark rights" (Mem. at 24), or alternatively, that "the Court should decline to exercise its discretion over Plaintiff's declaratory judgment claim" (*id.*).

28 U.S.C. § 2201 permits district courts to "declare the rights and other legal relations of any interest party seeking such a declaration," so long as there is "a case of actual controversy." Such a controversy must be "between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). The Supreme Court has acknowledged that the cases "do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). But one reason for the difficulty is that many infringement cases seeking declaratory judgments are brought by junior users in fear of litigation. In such cases, the threat of trademark litigation is, by definition, not immediate, and so courts must decide whether that risk rises to the level of a justiciable controversy. For example, in *MedImmune*, the Court considered whether an actual controversy existed in a declaratory judgment action brought by a patent licensee to invalidate a patent over which the licensee-plaintiff was continuing to pay royalties "under protest." *Id.* at 120-22. The Court reasoned that had the licensee-plaintiff stopped paying royalties on its license to use the defendant's patent entirely, there would have been "no dispute that [the Article III] standard would have been satisfied," because the cutoff of payments would have created an "imminent threat of harm" in the form of litigation. *Id* at 128. But even though that did not happen, the Supreme Court still held that jurisdiction existed over an infringement controversy because the royalty payments were being made under protest, as the

28

"involuntary or coercive nature of the exaction preserves the right to recover the sums paid or to challenge the legality of the claim." *Id.* at 131.

This is a more persuasive case for an actual declaratory judgment controversy than *MedImmune*. Sundaresan and Portkey have plausibly alleged ongoing trademark infringement causing a likelihood of consumer confusion. That satisfies Article III, regardless of whether Venkateswaran "never asserted Plaintiffs do not have . . . rights and ownership" of the TWOBADOUR and METAPURSE marks. (*Cf.* Mem. at 24.) Trademark cases do not turn on whether the defendant has made an overt statement that the marks in question are not owned by the plaintiff. Instead, the cases turn on whether there is a valid mark and a likelihood of confusion caused by the defendant's use. The *MedImmune* Court was concerned with how direct the threat of infringement litigation must be before an actual controversy exists sufficient to entertain a declaratory judgment action. But in this case, the litigation has already arrived. Because a declaratory judgment would settle an ongoing legal controversy between the parties, *i.e.*, whether Venkateswaran may make the alleged references to TWOBADOUR and PORTKEY, a request for such a remedy is properly before this Court.[4]

---

[4] The Court declines Venkateswaran's invitation to decline to exercise declaratory judgment jurisdiction. (*See* Mem. at 24-25.) Venkateswaran does not provide a reason that this case is apt for such a refusal. For the reasons already stated, there is a sufficiently definite and resolvable controversy in this case to entertain a request for declaratory relief, a determination that is in the "unique and substantial discretion" of this Court. *MedImmune*, 549 U.S. at 136 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

## IV.   Conclusion

For the foregoing reasons, Plaintiffs' motion to dismiss the complaint is GRANTED in part and DENIED in part.  Counts I, II, and IV are dismissed with prejudice for failure to state a claim.[5]  Counts III, V, VI, and VII state plausible claims upon which relief may be granted.

Defendants shall file an answer to the remaining claims within 14 days after the date of this opinion and order.  *See* Fed. R. Civ. P. 12(a)(4)(A).  The stay of discovery is hereby lifted. The parties are directed to file a revised proposed case management plan within 14 days.

The Clerk of Court is directed to close the motions at ECF Numbers 16 and 29.

SO ORDERED.

Dated: July 19, 2024
       New York, New York

_____
                J. PAUL OETKEN
          United States District Judge

---

[5] The Court concludes that granting leave to amend Counts I, II, and IV would be futile. Sundaresan and Portkey were already on notice of Venkateswaran's arguments concerning those Counts because the motion to dismiss was filed before the First Amended Complaint was filed but Plaintiffs chose not to plead any additional facts to supplement the relevant claims. Moreover, the First Amended Complaint omits even the basic allegations required to plead the cause of actions identified under Counts I, II, and IV, and therefore it would be futile to amend again.