P1OAPorC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

PORTKEY TECHNOLOGIES PTE LTD,
*et al.*,

               Plaintiff,

          v.                  23 Civ. 5074 (JPO)

ANAND VENKATESWARAN,

                        Remote Conference

               Defendant.

------------------------------x

                        New York, N.Y.
                        January 24, 2025
                        10:32 a.m.

Before:

                HON. J. PAUL OETKEN,

                        District Judge

                 APPEARANCES

DENTONS US LLP
     Attorneys for Plaintiff
BY:  ROBERT M. WASNOFSKI, JR.
     SARA M. GATES

ANAND VENKATESWARAN
     Pro Se Defendant

P1OAPorC

THE COURT:  Good morning.  This is Judge Oetken.

Mr. Hampton will call the case.

(Case called)

MR. WASNOFSKI:  Robert Wasnofski of Dentons.  With me is Sara Gates of Dentons.

THE COURT:  Good morning.

MR. WASNOFSKI:  Good morning.

THE COURT:  And the defendant, are you on?

MR. VENKATESWARAN:  Yes, sir.  This is Anand Venkateswaran, the defendant.

THE COURT:  Good morning.  How do you say your name?

MR. VENKATESWARAN:  Anand is fine, sir.  I think less for the long last name.

THE COURT:  What about the last name?  How do you say it?

MR. VENKATESWARAN:  Venkateswaran.

THE COURT:  Venkateswaran.  Okay.

MR. VENKATESWARAN:  Yes.

THE COURT:  Mr. Venkateswaran, I got your letter.  Are you now receiving notifications by e-mail on the case?

MR. VENKATESWARAN:  Yes, sir, I am.  Thank you.

THE COURT:  Okay.  Thank you.  I hope everything is okay with your son, and thank you for joining the call.

MR. VENKATESWARAN:  Thank you for asking, sir.  He is better.  There is a follow-up surgery on the 4th of February,

but he is on the road to recovery.  Thank you so much.

THE COURT:  All right.  Thank you.

Well, the first thing I want to address is your status as a pro se litigant versus having a lawyer.  I gather your prior counsel was not able to continue.  And have you had any luck -- I don't know if you've made efforts to get counsel pro bono or otherwise to represent you in this case.

MR. VENKATESWARAN:  I have not had much luck yet, sir.  The legal clinic provided a little bit of assistance, but understandably they are hard pressed for time and resources.  And I've not being able to make much headway.

THE COURT:  Okay.  And you're in Massachusetts; is that right?

MR. VENKATESWARAN:  That is correct, sir.

THE COURT:  Okay.  Well, we're here for this phone conference to discuss the various letters about discovery and protective order and to talk about the case going forward.  There is limited claims left, essentially a trademark infringement claim and a state law injunctive relief claim.  And I guess the first question we should talk about is the issue of a protective order.

Mr. Wasnofski, do you want to discuss that?

MR. WASNOFSKI:  Sure, your Honor.

We had, plaintiffs had, proposed a protective order, a single-tier protective order back in September when defendants

P1OAPorC

still had counsel.

Rather than markup that document, defendant's counsel sent by a different document.  It was two tier and that included attorneys' eyes only protection.  Shortly after, I think within a week or so, they had filed a motion to withdraw, and your Honor granted that motion and stayed the case effectively for 45 days.

After that period, we continued to communicate with defendant directly.  And we had marked up -- we thought it was easier to markup defendant's proposed document, even though it was -- they just provided their own new document.  And essentially we struck a second-tier confidentiality attorneys' eyes only.  Because well, one, we didn't think it was necessary anyway.  And, two, the defendant doesn't have counsel.

So we've essentially made some slight edits to defendant's proposed document.  And when we sent that to defendant himself, he basically said he was, you know, I think seeking pro bono counsel and needed more time to consider it. We followed up many times, had a meet and confer December 23, and had the same comment, didn't really engage on what our edits were.  He said he was going to I think talk to someone and reserved his comments until around January 10 he thought he would get back to us.  And we never heard back from him.

So I think it was a straightforward protective order. Again, along the lines of what his former counsel had proposed,

P1OAPorC

but we struck the attorneys' eyes only provision.

THE COURT:  Okay.  And, Mr. Venkateswaran.

MR. VENKATESWARAN:  Yes.

THE COURT:  Are you in a position to make any comments on the protective order?  I mean, I can just issue the protective order.

MR. VENKATESWARAN:  Yes.

THE COURT:  It has the ability of you, when you produce documents, to deem certain documents confidential so that they cannot be released in public filing essentially.

Do you have anything else that you want to comment on that?

MR. VENKATESWARAN:  Yes, sir.  In fact, a quick bit of context.  It might set some perspective from my side as well.

I don't appreciate the plaintiffs' point of view. Before they withdraw, my former counsel left me with three pieces of legal advice.  The first is that I do not produce documents until the protective order is in place.  The second is to stand my ground on the protective order draft that they had provided, which included that outside counsel eyes only designation.  And the third was to standby and issue discovery responses.

Now, with the withdrawal and the subsequent medical emergency of my son left me pummeled without sufficient legal guidance or bandwidth honestly to make any alternate decisions

P1OAPorC

about this.  But frankly, I don't believe I have the capacity to even, you know, consider if the plaintiffs' edits were minor or major.

So I would like to assure the Court and the plaintiffs that I fully intend to comply with whatever is required of me as soon as I can secure a little bit of guidance on how to proceed.  This is the context and the only reason my request for any extension of time.  Because being in these proceedings do not help me in the least.  It only harms my professional person further.

THE COURT:  So, I mean, you're going to be producing documents.  They're going to be producing documents to you.

MR. VENKATESWARAN:  Yes.

THE COURT:  That will be relevant to issues like whether there's a valid trademark, whether there was infringement, whether there's consumer confusion, likelihood of confusion.  And in particular, whether this was a fair use or nominative fair use, which I think we'll get to later, which I think, frankly, is going to be the focus of this discovery because I think those are going to be paramount issues.  But I don't know that you need -- why do you need an attorneys' eyes only designation?

MR. VENKATESWARAN:  Okay.  I mean, I will defer to you on this, sir.  I'm happy to comply with whichever protective order you propose.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P1OAPorC

THE COURT:  Well, I mean, you understand what attorneys' eyes only designation means.  Correct?

MR. VENKATESWARAN:  I do.

THE COURT:  It means they cannot show the individual plaintiff, but they can show the lawyers only.

Is there -- I mean, are you --

MR. VENKATESWARAN:  Yes, sir, the initial -- yeah. The initial rationale was I did not quite trust the plaintiffs themselves to keep my personal or private documents private. Which is why we had initially had that.  But I understand the Court's perspective.  If it's not confidential, it can be.

THE COURT:  Well, it can't be used publicly.  I mean, the main reason for an attorneys' eyes only designation is a situation where there are trade secrets or business secrets involved in the communications and the parties are competitors.

MR. VENKATESWARAN:  Okay.

THE COURT:  For example, a case Coke against Pepsi where you can't have sensitive marketing documents being shown to Coke's -- they can be shown to Coke's lawyer, but not to the Coke people because there's such sensitive competition going on.

Is that a rationale that applies to --

MR. VENKATESWARAN:  No, that does not apply at all, Judge.

THE COURT:  Are you competing with the plaintiff?

P1OAPorC

MR. VENKATESWARAN:  I am not, sir.  I am not.

THE COURT:  Okay.  Well, then I'm inclined to do a protective order that just has a confidential designation.  You know, I think that will be sufficiently protective and that will mean that what you designate as confidential will have to be redacted from public documents.  I believe that's how it will work.

Is that right, Mr. Wasnofski?

MR. WASNOFSKI:  That's right, your Honor.  And Mr. Venkateswaran did confirm during the meet and confer that he had no problem with our clients seeing whatever documents he produced.  So I do think there's just a bit of confusion on his part -- no disrespect, he's not an attorney -- as to, you know, what that second level of protection was.

THE COURT:  Okay.  Let me just step back for a minute and ask a couple questions.

First of all, Mr. Venkateswaran.

MR. VENKATESWARAN:  Yes, sir.

THE COURT:  The claims involve things like you using Twobadour and the other --

MR. VENKATESWARAN:  Metapurse.  Yes, sir.

THE COURT:  -- Metapurse trademark in things like your LinkedIn profile and in other respects and in conversation and basically taking credit for things that is confusing consumers.  Right?  That is, like basically saying that you have,

P1OAPorC

suggesting falsely, that you have a connection to those trademarked trademarks, you know, those identification of goods and services in an ongoing way.

Are you currently -- are there any LinkedIn profiles or anything going forward that -- is there any way in which you're continuing to do that, if you were?

MR. VENKATESWARAN:  No, sir.  I am not.

THE COURT:  All right.

Let me ask, Mr. Wasnofski, what does your client want? I mean, I got to say, this in some ways, looking back on it, I bent over backwards because the Second Circuit law is very permissive on these trademark claims.  But, I mean, the idea that putting something in your LinkedIn profile that uses something you actually did work on that's a trademarked term, it's so likely to be (a) nominative fair use, or (b) descriptive fair use.  And to not be likely to result in actual consumer confusion, that I'm pretty skeptical of these remaining claims.

So does your client want an apology or what?

MR. WASNOFSKI:  Your Honor, I don't know if appropriate to discuss settlement discussions.  There have been extensive settlement discussions.  What the client is trying to avoid is confusion in the marketplace to source, sponsorship, or affiliation.  This goes well beyond what was in a LinkedIn profile or Twitter profile.

P1OAPorC

He has, the defendant, has participated in countless conferences, in person, online, online interviews.  He has been perceived as, you know, somewhat of a -- I'll use this term, renaissance man in this space.  Riding on the coattails of my client, and, you know, through use of my clients' marks causing confusion.  And that's what discovery will show.  And ultimately, my client wants an injunction against its use.

THE COURT:  An injunction?  Is any of this ongoing?

MR. WASNOFSKI:  I'm not sure.  But whether or not he's voluntarily, you know, stopped temporarily or not, you know, we propose -- not to get too far into the weeds of this.  But we had proposed an agreement that would include a consent judgment that would include such terms prohibiting from doing X, Y, Z in the future.

So, yes, I mean, these cases are always, are always about injunctive relief, and at times also damages.  As your Honor knows, at the core of any trademark dispute is all about injunctive relief.

THE COURT:  Well, not always, but sometimes.

I mean, as far as I can tell, there's nothing left on any social media profiles.  The defendant claims he's not doing this.  I mean, I'll be -- we'll see what discovery shows, but you have to show that this is actually happening to get an injunction.  So I'm skeptical.  The idea that there is actual consumer confusion such that you would be able to show damages,

P1OAPorC

I'm skeptical.  And I'm not going to let this big law firm run roughshod over the defendant here.

MR. WASNOFSKI:  Your Honor, that is not our intent.  They were represented by able counsel up until two months ago.

THE COURT:  Well, when I look at these discovery requests, I'm concerned.

Now, I do think that we're going to have to have some discovery on -- you want a declaration that you have a valid trademark, and I think there's a question about that, too.  So we're going to have to look into whether these two trademarks are valid.  Because I'm not sure they're being used as trademark, but you're going to have to produce everything relevant to that to the defendant.

MR. WASNOFSKI:  Your Honor, there was -- and this will come out in further discovery -- but there was an agreement in place between the parties where the defendant acknowledged our clients' IP.  But, yes, I understand, this is --

THE COURT:  Not binding on me.

MR. WASNOFSKI:  This could be an issue.

THE COURT:  That's not binding on me.

MR. WASNOFSKI:  Understood.

THE COURT:  I'm going to sign the protective order.  I want, in the first round, documents produced on the validity of the trademark and on any confusion, actual or likely confusion; defendant's ongoing alleged violations, whether he's in any way

P1OAPorC

representing himself to be affiliated with the two trademarks; and anything relative to nominative fair use and descriptive fair use.

And when I say likelihood of confusion or actual confusion, anything that would show damages.  And I'll sign the protective order.  And I think we'll -- do you understand how production of documents works, Mr. Venkateswaran?

MR. VENKATESWARAN:  Yes, sir, I do.  My understanding is that I look for references to these trademarks in all the resources that I have.  The e-mails and, you know, any other folders across the board, and those become occasion of discovery.

THE COURT:  All right.  So in this first round of discovery, I'm going to have you exchange documents over the next let's say two months, and we'll have another call in March.  How is March 28th?

MR. VENKATESWARAN:  Yes, sir.  I will be there.

MR. WASNOFSKI:  I'm just checking my schedule.

THE COURT:  Okay.

MR. WASNOFSKI:  That's fine for plaintiff.

THE COURT:  Great.

Actually, sorry about that.  Could we make it April 4th instead?  That's the following week.  Could we make it April 4th?

MR. WASNOFSKI:  That's fine.

P1OAPorC

THE COURT:  All right.  At 10:30 a.m., same time.

MR. VENKATESWARAN:  Yes, sir.

MR. WASNOFSKI:  Yes, fine for plaintiffs.

THE COURT:  Great.  Thanks, everybody.  Anything else?

MR. WASNOFSKI:  Your Honor -- sorry.  Go ahead, Mr. Venkateswaran.

MR. VENKATESWARAN:  May I say something, Judge?

THE COURT:  Yeah.

MR. VENKATESWARAN:  So any references I have to Metapurse or Twobadour will all be on public domain when I worked.  So our association is not something that I conjured or I surmised.  It's something -- it's part of a vast number of media references and interviews that the plaintiff and I had done together and statements that we have put out together.

As for competition, the plaintiff does not really have consumers as such.  They do not sell a particular product, sir.  And neither do I at this point.

So, forgive me, I always had trouble understanding exactly where I was wrong in this because the only time I used that reference was mostly in the past tense.  And if at all I use Metapurse or Twobadour, you know, those names, was to describe something that I was already part of.  And those descriptions are out in the public domain and not just to include plaintiffs.

THE COURT:  Okay.  I understand that.

P1OAPorC

MR. WASNOFSKI:  Your Honor, I believe what he was getting at was there was an issue that we had during the meet and confer.  The defendant thought he did not have to produce documents that he said at some point were in the public domain, however it may be described --

MR. VENKATESWARAN:  Mr. Wasnofski, not specifically about that.  I am willing to produce any documents that I have access to.  No issues about that at all.

THE COURT:  Okay.  All right.  Anything else?

MR. WASNOFSKI:  Your Honor, yeah.  As far as the public documents, we had explained that just because he thinks the document may have been public at one point, that doesn't prevent him from producing it if it's within his control, custody, etc.  And that's where I believe he's coming from on that issue.

But a related issue is, you know, we did discuss that he intends to review certain e-mail addresses.  He has four e-mail addresses that he's used.  His counsel had agreed to have defendant review those four e-mail addresses for certain keywords that were already discussed.  And I believe Mr. Venkateswaran is still on, you know, on board with doing just that once the protective order has been entered.

But there was a dispute over whether he would produce text messages.  We believe the defendant has communicated, you know, outside of the e-mail using messages, text messages and

P1OAPorC

other messaging apps, with various folks in the industry.  So we had asked that his document production include relevant text messages, responsive text messages.  He was holding his ground on that saying he wouldn't produce that because of privacy concerns.

We assure him that anything he thinks is confidential, he should mark as such and we would of course honor that.  We told him we would honor the confidentiality designations months ago, even before your Honor entered the anticipated protective order.

THE COURT:  Yeah.  Okay.

Anything you want to add about that, Mr. Venkateswaran?

MR. VENKATESWARAN:  I don't mind -- the issue with the text messages was it felt intrusive.  I do not know how relevant they are to this, but if the Court decides that they need to be produced, I'm willing to comply.

THE COURT:  Yeah.  They do need to be produced if they're responsive.  I mean, if they're just -- to the extent they're just personal communications, you won't have to produce them.  But the ones that are responsive to, you know, any of the requests, that is, if they're communications about these trademarks.

MR. VENKATESWARAN:  Okay.

THE COURT:  And your affiliation, and any confusion,

then you do have to produce them.  But obviously, you can take out the parts that are purely personal.

MR. VENKATESWARAN:  I understand now.

THE COURT:  Also you should --

MR. VENKATESWARAN:  I was confused about that.  Yeah.

THE COURT:  Also you should not produce attorney/client privileged communications.  So anything you had with the firm that represented you or the lawyers there, any back and forth with them that's talking about seeking legal advice or getting legal advice from them, you should not produce those, whether e-mail or text or paper.

MR. VENKATESWARAN:  I understand, your Honor.

THE COURT:  Okay.  All right.

Anything else?  Thanks everybody.

MR. WASNOFSKI:  Your Honor, I'm sorry.  In addition to the production of documents, the defendants have not fully answered our written discover requests in good faith.  There are many, many erroneous objections.  We sent an eight-page, single space meet and confer letter back in September, and that led to us chasing the defendant's counsel and now the defendant.

I understand it would be easier if defendant was represented by counsel.  We were hoping that he would be because it does make these things easier.  But there is still that in our letter motion not only to compel him to produce

P1OAPorC

documents, but to give us amended interrogatory responses.

For example, throughout our interrogatory responses, they've only identified two people, the plaintiffs and the defendant.  Did not identify anyone else who may have information relevant to the subject matter, relevant to this court action.  And on the RFAs, out of 130 or so RFAs, they only answered 27 of those I believe.

So I don't wish to mire the Court in these details, but perhaps you can order defendant to have another meet and confer with us as an interim step to discuss that in good faith.  Because at the meet and confer we had in December, he basically said he was hoping to get counsel, you know, in the near future.  And that hasn't happened yet.

THE COURT:  All right.  Do you want to say anything about that?

MR. VENKATESWARAN:  Yes, sir.  It's like the plaintiff -- it's like Mr. Wasnofski said, your Honor.  Some of them are, you know, 70 pages long.  Some of them include 140 questions.  I think I will need some expert help on how to respond to those things.

I'm willing on good faith, I just lack the expertise to respond to that.

THE COURT:  Well, I mean, the questions, I don't want you to -- you know, I don't want you to be bombarded with 140 questions.

P1OAPorC

MR. WASNOFSKI:  Your Honor, he's referring to the RFAs and those were extensive.

THE COURT:  Yeah.

MR. WASNOFSKI:  Because most of those corresponded to documents that we -- that the plaintiff pulled from online. And asked him various questions about those concerning the truth and accuracy of the printout, etc.  This is all to streamline the case, not to bombard the defendant in any way, shape, or form.

THE COURT:  Well, I'm going to have you meet and confer about that.

Basically, Mr. Venkateswaran, there's a request for admissions where they can ask you to admit or deny something. And it should only be factual issues.  It's not like theories of the case or legal issues.  To the extent there are real facts on the ground that you can say, you know, yes or no to, you can answer.

MR. VENKATESWARAN:  Okay.

THE COURT:  If you can't, just don't answer it.  Same with interrogatories.  I don't want them -- I'm not going to let them ask you legal questions or try to get you to answer things that are not actual factual questions.  But if they're factual questions about dates and who's involved and what you did or didn't do or what you're doing or not doing, then I want you to try to answer those.  Okay?

P1OAPorC

MR. VENKATESWARAN:  Yes, sir.  Will do.

MR. WASNOFSKI:  Your Honor, with respect to interrogatories, we didn't ask any of those specific questions. We were just asking for individuals who had knowledge on X, Y, Z topics.  We were completely within the local rules.

THE COURT:  Okay.

MR. WASNOFSKI:  Again, in response to those, it only identified the plaintiff and the defendant.  No one else.  That is not a good faith answer.

Again, he's publicly known and has communicated with -- I don't know how many people.  And that's sort of why we're taking discovery.  But we know he's been communicating with others in regard to his use of these marks.  I'm just highlighting that as an obvious erroneous error in the responses.

THE COURT:  Okay.  Well, now that there's going to be a protective order, you can meet and confer and give it a shot again.  And then if there's issues, you can submit a letter again.  Okay?

MR. WASNOFSKI:  Okay.

THE COURT:  All right.  Thanks, everybody.  Have a good weekend.

(Adjourned)